# **<u>EXHIBIT A</u>**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X
JAMES R. PARISI,                                  Index No. 152803/2015

                              Plaintiff,

                                                  **FIRST AMENDED**
                                                  **COMPLAINT**

              v.

WIPRO LIMITED, WIPRO, LLC and
WIPRO TECHNOLOGIES,

                              Defendants.
------------------------------------------------------------------X

       Plaintiff, JAMES R. PARISI, by his attorneys, Jared T. Sullivan, P.C.,

complaining of and as and for his First Amended Complaint against Defendants,

WIPRO LIMITED, WIPRO, LLC and WIPRO TECHNOLOGIES, sets forth and

alleges upon information and belief as follows:

       1.     At all times relevant herein, plaintiff, JAMES R. PARISI ["Plaintiff"],

was and is an individual with a principal place of residence in the State of New

York, County of New York.

       2.     Upon information and belief, and at all times relevant herein,

defendant, WIPRO LIMITED, was and is a foreign business corporation (i)

organized in the Republic of India, (ii) registered with and authorized to do

business in the State of New York, (iii) conducting business in the State of New

York and the State of New Jersey, (iv) having its principal place of business at

1

Doddakannello, Sarjapur Road, Bangalore – 560 035, India and (v) maintaining offices and places of business at 1114 Avenue of the Americas, Suite 3030, New York, New York 10110 and 2 Tower Center Boulevard, Suite 2200, East Brunswick, New Jersey 08816.

3.      Upon information and belief, and at all times relevant herein, defendant, WIPRO, LLC, was and is a foreign limited liability company (i) organized in the State of Delaware, (ii) registered with and authorized to do business in the State of New York, (iii) conducting business in the State of New York and the State of New Jersey, (iv) having its principal place of business at 2 Tower Center Boulevard, Suite 2200, East Brunswick, New Jersey 08816 and (v) maintaining an office and place of business at 1114 Avenue of the Americas, Suite 3030, New York, New York 10110.

4.      Upon information and belief, and at all times relevant herein, defendant, WIPRO TECHNOLOGIES, was and is a business organization, "d/b/a" and/or trade name of defendant, WIPRO LIMITED, and/or defendant, WIPRO, LLC, (i) conducting business in the State of New York and the State of New Jersey, (ii) having principal places of business at 2 Tower Center Boulevard, Suite 2200, East Brunswick, New Jersey 08816 and 1114 Avenue of the Americas, Suite 3030, New York, New York 10110 and (iii) maintaining offices and places of business at

1114 Avenue of the Americas, Suite 3030, New York, New York 10110 and 2 Tower

Center Boulevard, Suite 2200, East Brunswick, New Jersey 08816.

5.      Defendants, WIPRO LIMITED, WIPRO, LLC and WIPRO

TECHNOLOGIES, are hereinafter collectively referred to as "WIPRO."

6.      WIPRO is a global information technology, consulting and

outsourcing company.

7.      At all times herein mentioned, WIPRO employed and continues to

employ approximately 160,000 employees globally and tens of thousands of

employees in the United States.

8.      WIPRO's fiscal year runs from April 1 of a given year through March

31 of the following year.

9.      Hereinafter, all named individuals to which Plaintiff refers and who

were and/or are employed with any of the Defendants named herein are alleged

to have, at all times herein mentioned, been acting on behalf of WIPRO and/or

within or during their respective capacities as officers, managers and/or

employees of WIPRO.

10.      On or about June 25, 2012, WIPRO hired Plaintiff as an Industry

Principal for Data & Analytics.

11.      Plaintiff was employed by and with WIPRO from June 25, 2012 to

March 24, 2014.

12.     During his employment with WIPRO, Plaintiff worked primarily in New York, New York.

13.     During 2012, Plaintiff also worked in WIPRO's New Jersey office for an average of 2-3 days per week.  From approximately January 1, 2013 through March 24, 2014, Plaintiff worked in WIPRO's New Jersey office for an average of 1 day per week.

14.     While employed with WIPRO, Plaintiff travelled to and worked in the State of Delaware on multiple, separate occasions as part of his involvement in a WIPRO account for a major pharmaceutical company.

15.     As part of having been hired as an Industry Principal by WIPRO, Plaintiff and WIPRO entered into a written Employment Agreement ["Agreement"].

16.     The Agreement provided that, with the exception of Section 6 (captioned "NON COMPETITION, NON-SOLICITATION, and CONFIDENTIALITY") of the Agreement, "this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware."

17.     As part of having been hired as an Industry Principal by WIPRO, Plaintiff's primary responsibilities involved building and running the East Coast (of United States) territory of the Data & Analytics group within the Industry Services Group ["ISG"], which was/is within WIPRO's "Pharma" group.

4

18.     In that role as Industry Principal, which lasted from June 25, 2012 through in or about May 2013, Plaintiff reported directly to Nitin Raizada.

19.     In or about December 2012, Mr. Raizada also became the head of ISG, which included the Data & Analytics group for which Plaintiff was an Industry Principal.

20.     At all times herein mentioned, Sangita Singh was the head of WIPRO's entire Life Sciences department, which included Pharma, ISG and the groups run by Shabbir Mejevdiwala—Farming Accounts ["Farming"] and Hunting Accounts ["Hunting"].

21.     In his role as an Industry Principal, and pursuant to the Agreement, Plaintiff's compensation consisted of, *inter alia*, an annual base salary, together with a bonus plan/program called Quarterly Performance Linked Compensation ["QPLC"].

22.     As set forth in the Agreement, QPLC "varies based on achievement of sales, profitability & utilization targets, or any other pre defined goals, per the applicable QPLC/Bonus plan."

23.     In 2012, Plaintiff was instrumental in, among other things, selling projects to and securing contracts with clients such as Johnson & Johnson and Novartis on behalf of WIPRO, and, by having done so, Plaintiff (i) exceeded his performance expectations for WIPRO's 2012 fiscal year, which ended on or about

5

March 31, 2013, and (ii) was owed and deserving of the entirety of his target QPLC for fiscal year 2012 under the Agreement.

24.     As such, Plaintiff met and exceeded his performance obligations under the Agreement and the terms and expectations of his employment with WIPRO.

25.     Moreover, Plaintiff more than met the goals and objectives identified to him by WIPRO in order to earn his target QPLC bonus, pursuant to and as set forth in the Agreement.

26.     In Fall 2012, a major project for a large pharmaceutical client was launched ["Project"].

27.     Plaintiff was instrumental in securing that client and the Project.

28.     The Project involved WIPRO's compilation of all required data and preparation of all necessary reports for the client to meet its reporting obligations and requirements under Section 6002 of the Patient Protection and Affordable Care Act ("Physician Payments Sunshine Act") ["Sunshine Act"].

29.     The Sunshine Act reporting deadline was on or before March 31, 2013.

30.     A "kickoff meeting" for the Project took place in Fall 2012, and Plaintiff was present for that meeting.

31.     During that "kickoff meeting" and at various other early stages of the Project, and due to the specific nature of the project, those involved in the Project were informed of the new reporting guidelines and obligations that pharmaceutical companies have under the Sunshine Act.

32.     In fact, in 2012, WIPRO prepared and distributed a PowerPoint presentation and compliance manual entitled *Aggregate Spend Management for Sunshine Compliance* for purposes of the Project and other similar projects.

33.     The large pharmaceutical client at issue in the Project was bound by and subject to the reporting requirements under the Sunshine Act, and, given the nature of the Project, WIPRO was hired by the client to compile all required data and prepare all necessary reports for the client to meet those reporting obligations and requirements.

34.     In late 2012, Plaintiff noticed in WIPRO's systems that the Project had not been allocated or credited in any way to Plaintiff, despite the vital role he played in securing the Project.

35.     Plaintiff confronted Mr. Raizada about that issue on multiple occasions beginning in late 2012.

36.     On several of those occasions, Mr. Raizada explained that, although a statement of work ["SOW"] for a project such as the Project is required to trigger events such as (i) billing, (ii) recording in WIPRO Pharma's financials, (iii)

generation of invoices and purchase orders, and (iv) recording of credit to employees such as Plaintiff, an SOW for the Project had yet to be signed for the Project.

37.     Mr. Raizada further explained that, before a project could technically be launched and before work could begin on it, a project had to be designated as "closed" in WIPRO's CRM system, a prerequisite of which is securing a signed SOW.

38.     Mr. Raizada told Plaintiff that those procedures are part of WIPRO's standard operating procedures.

39.     The lack of a signed SOW notwithstanding, work had in fact started on the Project in Fall 2012.

40.     Mr. Raizada repeatedly assured Plaintiff that, once the SOW is signed, all of the subsequent procedures, including crediting of the Project to Plaintiff, would be triggered.

41.     During late 2012, Plaintiff also heard discussions within WIPRO that the Project was not going well.

42.     In late 2012 and January 2013, Plaintiff made multiple requests to Mr. Raizada to speak further about the issues relating to the Project, including the unsigned SOW and the fact that credit for the Project had not been allocated to Plaintiff.  Those requests were to no avail.

8

43.     In or about late January or early February 2013, Plaintiff followed Mr. Raizada and the pharmaceutical client's (for the Project) client partner into a room and confronted them about those issues.

44.     Mr. Raizada and that client partner then closed the door to the room and explained to Plaintiff that there were problems with the Project, including failures to meet deadlines, delivery issues and the fact that the Project results/data were not turning out as the pharmaceutical client had hoped or planned.

45.     Mr. Raizada and that client partner further explained that, as a result, WIPRO and the client did not want to sign the SOW.

46.     Mr. Raizada and that client partner assured Plaintiff that, once the issues were resolved, Plaintiff would not have to worry about getting credit for the Project.  Moreover, Mr. Raizada and that client partner told Plaintiff to keep quiet.

47.     Throughout the remainder of February 2013 and into March 2013, Plaintiff began learning that, when the Project was originally "kicked off" in fall 2012 and due to the short period of time between fall 2012 and March 31, 2013, it was already decided by WIPRO to not have the SOW signed just in case the work on the Project was not completed in time for the March 31, 2013 Sunshine Act reporting deadline, notwithstanding the fact that work was being performed on and reportable information and data was in fact being generated by the Project.

9

48. Plaintiff learned that the reasoning behind that decision was that, in the event the client was not able to meet the March 31, 2013 Sunshine Act reporting deadline, WIPRO would keep the SOW from being signed and, as such, was planning to blame the "unclosed"/"unlaunched" Project on "technical issues" in an attempt to justify or explain a possible failure by the client to meet the March 31, 2013 reporting deadline.

49. Over that period of time, Plaintiff learned that those efforts escalated as concerns grew stronger that the client would not be able to comply with the reporting deadline.

50. In the early months of 2013, Plaintiff also began learning that at least one of his superiors/managers was manipulating certain project sales/booking and revenue reporting data and hiding certain projects in WIPRO's CRM/Financial system in an effort to apply more personal bonus money and performance credit to those superiors/managers and others in Plaintiff's group.

51. At that time, Plaintiff also learned that those superiors/managers— at the realization by those superiors/managers that the Pharma, ISG and/or the Data & Analytics groups' fiscal year 2012 sales/booking and revenue performance figures would not meet expectations—were deliberately delaying reporting of certain project sales/booking and revenue data to fiscal year 2013 and hiding certain projects in WIPRO's CRM/Financial system for purposes of "sandbagging"

those projects so as to increase the Pharma, ISG and/or Data & Analytics groups' sales/booking and revenue figures for fiscal year 2013 and to get an "early jump" on fiscal year 2013.

52.     Upon learning that information, and as a result of those unethical and illegal business practices, Plaintiff realized that he (and others in his group) may find himself being personally deprived of earned bonus money and performance credit.

53.     Upon learning that information, Plaintiff realized that those unethical and illegal business practices could also lead to and result in larger-scale false financial reporting, false marketing and false advertising by WIPRO to a variety of entities, such as various governmental bodies and agencies, the general public, existing WIPRO shareholders, prospective WIPRO shareholders, existing WIPRO clients and prospective WIPRO clients.

54.     Plaintiff believed, continues to believe and was/is reasonable in his belief that the foregoing practices were/are illegal, fraudulent and unethical.

55.     Plaintiff also believed that, as a result of some of the foregoing practices and conduct of at least one of his superiors/managers, Plaintiff and others in his group were, in effect, being stolen from—something Plaintiff knew to be illegal.

56.     Plaintiff further believed that the foregoing practices and conduct were in violation of the Sunshine Act or, at the very least, in deliberate, wrongful circumvention of the Sunshine Act.

57.     During multiple discussions with Mr. Raizada, Plaintiff objected to and spoke out against the foregoing practices and conduct, but Mr. Raizada simply told Plaintiff to keep quiet.

58.     Plaintiff refused to participate in or have any connection whatsoever with any of the foregoing activity.  Therefore, plaintiff determined that he could no longer work with Mr. Raizada or be a part of ISG.

59.     After realizing that he no longer wanted to work under Mr. Raizada or be a part of ISG, Plaintiff approached Mr. Mejevdiwala about joining Mr. Mejevdiwala's Hunting group.

60.     There was at least one other employee in the ISG group who also asked to move groups due to the same concerns held by Plaintiff.

61.     On or about April 1, 2013, it was decided that Plaintiff would join Hunting, but Plaintiff's transition from ISG to Hunting was not fully implemented until on or about May 20, 2013.  Accordingly, Plaintiff was still doing some work for ISG and Mr. Raizada during that transition period.

62.     On or about April 12, 2013, Plaintiff also witnessed inappropriate physical interaction between one of his superiors in ISG and an employee who

reported directly to that superior and was similarly-situated as Plaintiff.  Plaintiff believed, continues to believe and was/is reasonable in his belief that the foregoing incidents were/are unethical and subject to mandatory internal reporting at WIPRO.

63.    On   multiple   occasions,   Plaintiff   also   witnessed   multiple superiors/managers and other members in the Pharma group make assumptions about the sexual orientation of a particular senior officer of WIPRO, and, based on those assumptions, make and engage in inappropriate and offensive jokes in that regard.  Plaintiff believed, continues to believe and was/is reasonable in his belief that the foregoing practices were/are illegal, unethical and subject to mandatory internal reporting at WIPRO.

64.    On or about May 5, 2013, Plaintiff learned for certain that he would not be receiving any QPLC bonus money for fiscal year 2012.  He then approached Mr. Raizada and Mr. Mejevdiwala about that matter, but he was told by them to keep quiet.

65.    Upon learning of the foregoing unethical and illegal practices and witnessing the foregoing incidents, Plaintiff also made a complaint to WIPRO's Human Resources department ["HR"] within the Pharma group about all of those practices and incidents, but Plaintiff's efforts in that regard went ignored, were blocked and/or were inexplicably delayed.

66.     For a period of approximately two months after reporting the foregoing practices and incidents to HR, Plaintiff called HR several times and initiated ultimately fruitless and empty email exchanges with HR about the status of the investigations into those complaints.  Plaintiff's primary contact in HR for those complaints was Paromita Bhattacharjee.

67.     Plaintiff then learned from a fellow employee that WIPRO had/has an internal Ombuds department and process—a fact that was not previously disclosed to Plaintiff by anyone at WIPRO.

68.     In or about July 2013, Plaintiff filed a complaint with Ombuds about all of the foregoing practices and incidents.

69.     When Plaintiff filed his complaint with Ombuds, he was required to electronically-sign and agree to the terms and conditions of the Ombuds process. The presentation of those terms and conditions to him operated as WIPRO's agreement to those terms and conditions.

70.     Those terms and conditions provided, in part, that Plaintiff would not and could not be the target of harassment, victimization (including informal pressures) or retaliation for a complaint made or concern raised in good faith to Ombuds.

71.     Under those terms and conditions, WIPRO was also required to comply with, follow and implement the determinations and directions of Ombuds.

14

72.    The Ombuds investigation required the assistance and cooperation of, *inter alia*, Mr. Naizada, particularly with respect to the inquiries related to (i) the Project, unsigned SOW and Sunshine Act issues, (ii) Plaintiff's fiscal year 2012 sales/booking and revenue numbers and (iii) the Johnson & Johnson and Novartis projects, but Mr. Naizada was very uncooperative with that investigation and evasive of the information and document requests made by Ombuds during that investigation.

73.    Plaintiff's complaints to Mr. Raizada, Mr. Mejevdiwala, HR and Ombuds were made in good faith and were not limited solely to the fact that the foregoing practices and incidents resulted in the deprivation of Plaintiff of the QPLC bonus money he was owed for fiscal year 2012.

74.    The deprivation of Plaintiff of that bonus money was a by-product— albeit deliberate—of the foregoing practices.  As such, he would have reported those practices in good faith, irrespective of the existence of the bonus money issue.

75.    In fact, the other incidents witnessed by Plaintiff—particularly the sexual orientation jokes and remarks, which Plaintiff knew to be in violation of human rights and civil rights laws—bore no relation to the bonus money issue.

76.    Over the following months, Plaintiff began to experience what he reasonably perceived to be retaliatory treatment by, *inter alia*, Ms. Singh, Mr.

Raizada, Mr. Mejevdiwala and Ms. Bhattacharjee in response to the complaint Plaintiff filed with Ombuds.

77.     In fact, Plaintiff began to notice that multiple project and sales leads—including those related to clients assigned/credited to Plaintiff—were deliberately kept from Plaintiff and were assigned and/or given to other employees (notwithstanding those projects and leads often being outside of those other employees' respective territories) in the Farming and Hunting groups, which prevented Plaintiff from meeting his fiscal year 2013 performance targets.

78.     Also, on at least one occasion, a necessary meeting organized by Plaintiff (which was paramount to Plaintiff's productivity and performance) was inexplicably cancelled with the help and interference of Mr. Raizada, which was allowed to occur and was not blocked by Mr. Mejevdiwala.

79.     On or about October 17, 2013, Ombuds informed Plaintiff it had determined that certain of the fiscal year 2012 project sales/bookings and revenue at issue in the Ombuds investigation should have been and would be credited to Plaintiff.

80.     Furthermore, Plaintiff was informed by Ombuds that Ombuds found merit in Plaintiff's reports/complaints as to the foregoing practices and incidents, and Ombuds assured Plaintiff that those matters and findings would be addressed with the involved parties over time.

81.    Ombuds directed WIPRO to pay Plaintiff certain QPLC bonus money for fiscal year 2012.

82.    However, the amount of QPLC bonus money awarded to Plaintiff by Ombuds for fiscal year 2012 still did not constitute the full amount owed to Plaintiff as part of his target QPLC for fiscal year 2012 under the Agreement.

83.    On October 18, 2013 (the day after the determination by Ombuds), Plaintiff was informed by Mr. Mejevdiwala and Ms. Bhattacharjee (due, in part, to direction from Ms. Singh) that he was being placed on a 45-day Performance Improvement Plan ["PIP"]; in doing so, Mr. Mejevdiwala and Ms. Bhattacharjee claimed that Plaintiff was not meeting his performance expectations and goals.

84.    At all times herein mentioned, WIPRO required that an employee be placed on and complete a PIP before being eligible for termination of employment.

85.    Given the retaliatory treatment that Plaintiff had already experienced, and in view of the Ombuds determination that was revealed on October 17, 2013, Plaintiff reasonably perceived his placement on PIP as another form of retaliation.

86.    Plaintiff then filed another complaint with Ombuds regarding his having been placed on a PIP.  That complaint included his belief that, *inter alia*, (i) even if warranted, the PIP should have been for 90 days pursuant to WIPRO policy as opposed to 45 days, (ii) other similarly-situated employees in the Farming and

17

Hunting groups who had similar or worse revenue figures as Plaintiff were not also placed on PIP and (iii) the Ombuds findings regarding Plaintiff's performance in fiscal year 2012 should have, at the very least, kept him out of eligibility for a PIP in fiscal year 2013.

87.     Over the following months, Ombuds found, *inter alia*, that the PIP on which Plaintiff had been placed was in violation of WIPRO procedure, was not and should not have been applicable to Plaintiff and, even if warranted, was not for the required minimum period of 90 days.

88.     Ombuds determined that Plaintiff should have been taken off the PIP, and, as such, Ombuds informed Plaintiff that Mr. Mejevdiwala and Ms. Bhattacharjee would be implementing that determination.

89.     Instead, over the following months, Mr. Mejevdiwala and Ms. Bhattacharjee repeatedly ignored and defied the Ombuds determinations and directives, and, in a misguided and disingenuous effort to comply with WIPRO policy, repeatedly extended the PIP period until it covered a total period of at least 90 days.  Further in that regard, Mr. Mejevdiwala and Ms. Bhattacharjee did not even begin a new 90-day PIP in compliance with WIPRO policy; instead, Mr. Mejevdiwala and Ms. Bhattacharjee simply added time to an already-defective PIP.

90.     During that period of multiple extensions of the PIP, Plaintiff was repeatedly asked by Mr. Mejevdiwala and Ms. Bhattacharjee to provide information about his progress in meeting the performance targets and goals outlined in the PIP.  In response, Plaintiff would repeatedly (i) inform and remind Mr. Mejevdiwala and Ms. Bhattacharjee of the determinations and directives issued by Ombuds in the first instance and the fact that Plaintiff was being deliberately prevented from meeting those targets and goals and (ii) request the intervention and involvement of Ombuds and other senior-level officers within WIPRO in those discussions.

91.     Plaintiff and his requests, however, were repeatedly ignored, evaded and/or dismissed.

92.     Also, in or about November 2013, Plaintiff, Ombuds and Mr. Raizada—who was no longer Plaintiff's manager—were on a conference call regarding payment of Plaintiff's QPLC bonus money, at which time Mr. Raizada revealed (i) knowing that Plaintiff was on a PIP and (ii) that he (Mr. Raizada) was part of the decision within Pharma to place Plaintiff on a PIP.

93.     Also, in or about December 2013, Ombuds discovered that its request that Plaintiff be paid his QPLC bonus money for fiscal year 2012 went ignored. Accordingly, Ombuds escalated that request and facilitated that payment to Plaintiff through its own efforts.

94.     Ombuds found that Mr. Raizada's knowledge of and participation in Plaintiff's placement on PIP was in violation of various WIPRO's policies, including those regarding confidentiality, privacy and conflicts.

95.     Over the course of all of the foregoing Ombuds investigations, Ombuds also found evidence of retaliation and the false/delayed financial reporting described herein.

96.     Furthermore, over the course of all of the foregoing Ombuds investigations and the months following Plaintiff's placement on PIP, Mr. Mejevdiwala often (i) confronted Plaintiff in anger about Plaintiff's complaints with HR and Ombuds and (ii) told Plaintiff that he (Mr. Mejevdiwala) was free to do anything he pleased with his groups and that Ombuds has no right to direct him what to do.

97.     On March 24, 2014, Plaintiff received an email from Ms. Bhattacharjee informing Plaintiff that he was terminated from his employment with WIPRO and that March 24, 2014 would be his last day of that employment.

98.     Plaintiff's termination from WIPRO was another form of retaliation against Plaintiff for his complaints to HR and Ombuds.

99.     As a result of the foregoing, Plaintiff was deprived in fiscal year 2013 of either (i) at least tens of thousands of dollars in QPLC bonus money that he could have earned had he remained in ISG (which he was constrained to leave) or

(ii) potentially hundreds of thousands of commission dollars that he could have earned in Hunting had he been afforded a fair opportunity to perform and succeed and had he not been a target and victim of retaliation.

100.    On multiple occasions during the foregoing Ombuds investigations and the foregoing PIP periods, Plaintiff was told by Ombuds that (i) he was 100% correct about the business practices, conduct and incidents that he reported to Ombuds, (ii) multiple projects were wrongfully not allocated to Plaintiff, (iii) Ombuds would be informing the involved parties of those determinations and (iv) Ombuds would be addressing those matters with the involved parties.

101.    On multiple occasions, Ombuds told Plaintiff that (i) he was a victim of retaliation, (ii) his placement on PIP was improper and inappropriate and, (iii) even if his placement on PIP was proper or appropriate, it was not carried out or enforced in a compliant manner.

102.    An Ombuds representative also told Plaintiff that, in the 10+ years that she had been with Ombuds, WIPRO's treatment of Plaintiff was the very first time she had seen WIPRO not comply with an Ombuds directive/determination.

103.    As a result of the foregoing, Plaintiff suffered lost earnings, lost compensation, lost benefits, harm to his reputation, harm to his career and emotional distress.

## AS AND FOR A FIRST CAUSE OF ACTION

104.    Plaintiff repeats and realleges the contents of the prior paragraphs with the same force and effect as if more fully set forth herein.

105.    Plaintiff's repeated disclosure, complaints and well-documented notice to WIPRO with respect to the foregoing business practices and other incidents perpetuated by WIPRO and Plaintiff's refusal to participate in said practices and incidents constitute protected conduct under the Conscientious Employee Protection Act ["CEPA"], N.J.S.A. 34:19-1 to 34:19-8, of the State of New Jersey.

106.    Said disclosure, complaints and notice by Plaintiff afforded WIPRO a reasonable opportunity to correct said business practices, which were in clear violation of various local, state and federal laws, including the Sunshine Act and multiple local, state and federal human rights and civil rights laws.

107.    Based upon the foregoing facts, Plaintiff had and continues to have a good faith, reasonable belief that WIPRO was perpetuating fraud and other illegal and deceitful business practices on, *inter alia*, its employees, shareholders, clients, governmental bodies and agencies, and other third parties.

108.    Upon information and belief, key management and senior-level personnel within WIPRO were aware of those business practices and were

operating in spite of the illegality of those practices, even after Plaintiff notified them of said illegal business practices.

109.    The only factors in WIPRO's decisions to, *inter alia*, deliberately interfere with Plaintiff's job performance, place him on a PIP and terminate him was (i) Plaintiff's refusal to engage in and/or ignore those illegal business practices and (ii) Plaintiff's disclosure, complaints and notice to WIPRO of the foregoing business practices and other incidents.

110.    WIPRO's deliberate interference with Plaintiff's job performance, placement and maintenance of Plaintiff on a PIP, defiance of the Ombuds determinations and directives and wrongful termination and retaliatory personnel discharge of Plaintiff was malicious, egregious, retaliatory, deliberately planned and carried out in clear violation of CEPA.

111.    Those decisions and retaliatory actions by WIPRO created a hostile work environment for Plaintiff.

112.    As a result of those decisions and retaliatory actions by WIPRO, Plaintiff has suffered lost earnings, lost compensation, lost benefits, harm to his reputation, harm to his career and emotional distress.

113.    By reason of the foregoing, Plaintiff is entitled to (i) monetary damages in a sum to be determined at trial, but not less than $2,000,000.00, with pre-judgment interest thereon, (ii) punitive and exemplary damages in a sum to

be determined at trial and (iii) all costs and expenses incurred in the commencement and maintenance of this action, including reasonable attorneys' fees, costs and disbursements.

## AS AND FOR A SECOND CAUSE OF ACTION

114.    Plaintiff repeats and realleges the contents of the prior paragraphs with the same force and effect as if more fully set forth herein.

115.    Plaintiff's repeated disclosure, complaints and well-documented notice to WIPRO with respect to the foregoing business practices and other incidents perpetuated by WIPRO and Plaintiff's refusal to participate in said practices and incidents constitute protected conduct under The Delaware Whistleblowers' Protection Act ["DWPA"] (Title 19, Chapter 17 of the Delaware Code).

116.    Said disclosure, complaints and notice by Plaintiff afforded WIPRO a reasonable opportunity to correct said business practices, which were in clear violation of various local, state and federal laws, including the Sunshine Act and multiple local, state and federal human rights and civil rights laws.

117.    Based upon the foregoing facts, Plaintiff had and continues to have a good faith, reasonable belief that WIPRO was perpetuating fraud and other illegal and deceitful business practices on, *inter alia*, its employees, shareholders, clients, governmental bodies and agencies, and other third parties.

118.    Upon information and belief, key management and senior-level personnel within WIPRO were aware of those business practices and were operating in spite of the illegality of those practices, even after Plaintiff notified them of said illegal business practices.

119.    The only factors in WIPRO's decisions to, *inter alia*, deliberately interfere with Plaintiff's job performance, place him on a PIP and terminate him was (i) Plaintiff's refusal to engage in and/or ignore those illegal business practices and (ii) Plaintiff's disclosure, complaints and notice to WIPRO of the foregoing business practices and other incidents.

120.    WIPRO's deliberate interference with Plaintiff's job performance, placement and maintenance of Plaintiff on a PIP, defiance of the Ombuds determinations and directives and wrongful termination and retaliatory personnel discharge of Plaintiff was malicious, egregious, retaliatory, deliberately planned and carried out in clear violation of DWPA.

121.    Those decisions and retaliatory actions by WIPRO created a hostile work environment for Plaintiff.

122.    As a result of those decisions and retaliatory actions by WIPRO, Plaintiff has suffered lost earnings, lost compensation, lost benefits, harm to his reputation, harm to his career and emotional distress.

123.    By reason of the foregoing, Plaintiff is entitled to (i) monetary damages in a sum to be determined at trial, but not less than $2,000,000.00, with pre-judgment interest thereon, (ii) punitive and exemplary damages in a sum to be determined at trial and (iii) all costs and expenses incurred in the commencement and maintenance of this action, including reasonable attorneys' fees, costs and disbursements.

## AS AND FOR A THIRD CAUSE OF ACTION

124.    Plaintiff repeats and realleges the contents of the prior paragraphs with the same force and effect as if more fully set forth herein.

125.    Plaintiff's repeated disclosure, complaints and well-documented notice to WIPRO with respect to the foregoing business practices and other incidents perpetuated by WIPRO and Plaintiff's refusal to participate in said practices and incidents constitute protected conduct.

126.    Said disclosure, complaints and notice by Plaintiff afforded WIPRO a reasonable opportunity to correct said business practices, which were in clear violation of various local, state and federal laws, including the Sunshine Act and multiple local, state and federal human rights and civil rights laws.

127.    Based upon the foregoing facts, Plaintiff had and continues to have a reasonable belief that WIPRO was perpetuating fraud and other illegal and

deceitful business practices on, *inter alia*, its employees, shareholders, clients, governmental bodies and agencies, and other third parties.

128.   Upon information and belief, key management and senior-level personnel within WIPRO were aware of those business practices and were operating in spite of the illegality of those practices, even after Plaintiff notified them of said illegal business practices.

129.   The only factors in WIPRO's decisions to, *inter alia*, deliberately interfere with Plaintiff's job performance, place him on a PIP and terminate him was (i) Plaintiff's refusal to engage in and/or ignore those illegal business practices and (ii) Plaintiff's disclosure, complaints and notice to WIPRO of the foregoing business practices and other incidents.

130.   WIPRO's deliberate interference with Plaintiff's job performance, placement and maintenance of Plaintiff on a PIP, defiance of the Ombuds determinations and directives and wrongful termination and retaliatory personnel discharge of Plaintiff was malicious, egregious, retaliatory, deliberately planned and carried out, all of which constitutes common law wrongful discharge in clear violation of public policy, federal law and/or the laws of the State of New York, State of New Jersey and/or State of Delaware.

131.   Those decisions and retaliatory actions by WIPRO created a hostile work environment for Plaintiff.

132.    As a result of those decisions and retaliatory actions by WIPRO, Plaintiff has suffered lost earnings, lost compensation, lost benefits, harm to his reputation, harm to his career and emotional distress.

133.    By reason of the foregoing, Plaintiff is entitled to (i) monetary damages in a sum to be determined at trial, but not less than $2,000,000.00, with pre-judgment interest thereon, (ii) punitive and exemplary damages in a sum to be determined at trial and (iii) all costs and expenses incurred in the commencement and maintenance of this action, including reasonable attorneys' fees, costs and disbursements.

### AS AND FOR A FOURTH CAUSE OF ACTION

134.    Plaintiff repeats and realleges the contents of the prior paragraphs with the same force and effect as if more fully set forth herein.

135.    The above-described conduct of WIPRO, including WIPRO's deliberate defiance of the above-described determinations and directives of Ombuds, constitutes numerous breaches of the Agreement, the terms and conditions of the Ombuds process, and the mutual obligations inherent in and associated with the employer-employee relationship that existed between WIPRO and Plaintiff.

136.   The above-alleged business practices and conduct of WIPRO were deliberate and interfered with payment to Plaintiff of the full amount of bonus money that was owed to him for fiscal year 2012.

137.   Moreover, the above-alleged deliberate interference by WIPRO with Plaintiff's ability to perform within the Hunting group and thereby retain his employment and earn his salary and bonus constitutes multiple breaches of t the Agreement, the terms and conditions of the Ombuds process, and the mutual obligations inherent in and associated with the employer-employee relationship that existed between WIPRO and Plaintiff.

138.   Furthermore, as a result of WIPRO's conduct, Plaintiff was deprived in fiscal year 2013 of either (i) at least tens of thousands of dollars in QPLC bonus money that he could have earned had he remained in ISG (which he was constrained to leave) or (ii) potentially hundreds of thousands of commission dollars that he could have earned in Hunting had he been afforded a fair opportunity to perform and succeed and had he not been a target and victim of retaliation.

139.   As a result of the foregoing, Plaintiff suffered lost earnings, lost compensation, lost benefits, harm to his reputation, harm to his career and emotional distress.

140.    As a result of the above-described conduct of and breaches by WIPRO, Plaintiff has been damaged in the amount of Two Million ($2,000,000.00) Dollars.

141.    By reason of the foregoing, Plaintiff is entitled to (i) monetary damages in a sum to be determined at trial, but not less than $2,000,000.00, with pre-judgment interest thereon, and (ii) all costs and expenses incurred in the commencement and maintenance of this action, including reasonable attorneys' fees, costs and disbursements.

## AS AND FOR A FIFTH CAUSE OF ACTION

142.    Plaintiff repeats and realleges the contents of the prior paragraphs with the same force and effect as if more fully set forth herein.

143.    The above-described conduct of WIPRO, including WIPRO's deliberate defiance of the above-described determinations and directives of Ombuds, constitutes numerous breaches of the implied covenant of good faith and fair dealing inherent in and associated with the Agreement, the terms and conditions of the Ombuds process and the mutual obligations inherent in and associated with the employer-employee relationship that existed between WIPRO and Plaintiff.

144.    Also, the above-alleged business practices and conduct of WIPRO were deliberate and interfered with payment to Plaintiff of the full amount of bonus money that was owed to him for fiscal year 2012.

145.    Moreover, the above-alleged deliberate interference by WIPRO with Plaintiff's ability to perform within the Hunting group and thereby retain his employment and earn his salary and bonus constitutes multiple breaches of the implied covenant of good faith and fair dealing inherent and associated with the Agreement, the terms and conditions of the Ombuds process and the mutual obligations inherent in and associated with the employer-employee relationship that existed between WIPRO and Plaintiff.

146.    Furthermore, as a result of WIPRO's conduct, Plaintiff was deprived in fiscal year 2013 of either (i) at least tens of thousands of dollars in QPLC bonus money that he could have earned had he remained in ISG (which he was constrained to leave) or (ii) potentially hundreds of thousands of commission dollars that he could have earned in Hunting had he been afforded a fair opportunity to perform and succeed and had he not been a target and victim of retaliation.

147.    As a result, Plaintiff suffered lost earnings, lost compensation, lost benefits, harm to his reputation, harm to his career and emotional distress.

148.    As a result of the above-described conduct of and breaches by WIPRO, Plaintiff has been damaged in the amount of Two Million ($2,000,000.00) Dollars.

149.    By reason of the foregoing, Plaintiff is entitled to (i) monetary damages in a sum to be determined at trial, but not less than $2,000,000.00, with pre-judgment interest thereon, and (ii) all costs and expenses incurred in the commencement and maintenance of this action, including reasonable attorneys' fees, costs and disbursements.

### AS AND FOR AN SIXTH CAUSE OF ACTION

150.    Plaintiff repeats and realleges the contents of the prior paragraphs with the same force and effect as if more fully set forth herein.

151.    The Agreement provides, in part, that "[t]he prevailing party in any legal action between the parties arising out of this Agreement will be entitled, in addition to any other rights and remedies such party may have, to reimbursement for such party's legal expenses, including court costs and reasonable attorney's fees."

152.    Accordingly, Plaintiff is contractually-entitled to collect from WIPRO all costs, fees and expenses incurred in the commencement and maintenance of this action, including reasonable attorneys' fees, court costs and disbursements.

32

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

(a)     Against Defendants, on the First Cause of Action, (i) monetary damages in a sum to be determined at trial, but not less than $2,000,000.00, with pre-judgment interest thereon, (ii) punitive and exemplary damages in a sum to be determined at trial and (iii) all costs and expenses incurred in the commencement and maintenance of this action, including reasonable attorneys' fees, costs and disbursements;

(b)     Against Defendants, on the Second Cause of Action, (i) monetary damages in a sum to be determined at trial, but not less than $2,000,000.00, with pre-judgment interest thereon, (ii) punitive and exemplary damages in a sum to be determined at trial and (iii) all costs and expenses incurred in the commencement and maintenance of this action, including reasonable attorneys' fees, costs and disbursements;

(c)     Against Defendants, on the Third Cause of Action, (i) monetary damages in a sum to be determined at trial, but not less than $2,000,000.00, with pre-judgment interest thereon, (ii) punitive and exemplary damages in a sum to be determined at trial and (iii) all costs and expenses incurred in the commencement and maintenance of this action, including reasonable attorneys' fees, costs and disbursements;

(d)     Against Defendants, on the Fourth Cause of Action, (i) monetary damages in a sum to be determined at trial, but not less than $2,000,000.00, with pre-judgment interest thereon, and (ii) all costs and expenses incurred in the commencement and maintenance of this action, including reasonable attorneys' fees, costs and disbursements;

(e)     Against Defendants, on the Fifth Cause of Action, (i) monetary damages in a sum to be determined at trial, but not less than $2,000,000.00, with pre-judgment interest thereon, and (ii) all costs and expenses incurred in the commencement and maintenance of this action, including reasonable attorneys' fees, costs and disbursements;

(f)     Against Defendants, on the Sixth Cause of Action, all costs, fees and expenses incurred in the commencement and maintenance of this action, including reasonable attorneys' fees, court costs and disbursements; and

(g)     Such other and further relief as this Court deems just and proper.

Dated:  Garden City, New York
         February 12, 2016

JARED T. SULLIVAN, P.C.

By: _____
      Jared T. Sullivan
      *Attorneys for Plaintiff*
      65 Hilton Avenue
      Garden City, New York 11530
      T: (516) 877-1988

34

F: (516) 453-0201
jared@jtsullivanlaw.com

To:

***Via NYSCEF only***
James P. Anelli
Carmon M. Harvey
Lisa L. Savadjian
LECLAIRRYAN
*Attorneys for Defendants*
885 3rd Avenue, 16th Floor
New York, New York 10022
(973) 491-3550