UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

JAMES R. PARISI,

                                Plaintiff,

                -v-

WIPRO LIMITED, WIPRO, LLC and WIPRO
TECHNOLOGIES,

                            Defendants.

------------------------------------------------------------------ X

16 Civ. 1824 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

      This case involves an employee's claim that his employer retaliated against him,
including by terminating his employment, after he acted as a whistleblower.  Plaintiff James
Parisi seeks damages from defendants Wipro Limited, Wipro LLC, and Wipro Technologies
(collectively "Wipro"), bringing claims under New Jersey and Delaware whistleblower statutes
as well as tort and breach of contract claims.  Wipro moves to dismiss, under Federal Rule of
Civil Procedure 12(b)(6).  For the reasons that follow, the Court grants Wipro's motion.

**I.**      **Background**

      **A.**      **Factual Background**[1]

---

[1] The Court draws these facts principally from Parisi's Second Amended Complaint, Dkt. 21
("SAC"), and the attached exhibits.  *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d
Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule
12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to
the complaint as exhibits, and documents incorporated by reference in the complaint.").  The
Court accepts all factual allegations in the SAC as true, drawing all reasonable inferences in
Parisi's favor.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

### 1.    Parisi's Employment with Wipro

Between June 25, 2012, and March 24, 2014, Parisi worked as an employee of Wipro, a global information technology, consulting, and outsourcing company. SAC ¶ 7, 12. Parisi primarily worked in Wipro's New York City offices. *Id.* ¶ 13. However, he also traveled for work to New Jersey between one and three times a week, *id.* ¶ 14, and to Delaware "on multiple, separate occasions," *id.* ¶15.

Between June 25, 2012, and May 20, 2013, Parisi held the position of Industry Principal for Data & Analytics ("Industry Principal") within the Industry Services Group ("ISG") of Wipro's "Pharma" group. SAC ¶ 18–19. As such, Parisi was responsible for "building and running the East Coast territory of the Data & Analytics group." *Id.* His immediate supervisor throughout this time period was Nitin Raizada, who in December 2012 became head of ISG. *Id.* ¶¶ 19-20.

Between May 20, 2013, and March 24, 2014, Parisi worked as an Industry Principal in the "Hunting" group within Pharma. *Id.* ¶¶ 68–70.

### 2.    The Employment Agreement

A written Employment Agreement, Dkt. 29 ("Agreement"), governed Parisi's employment with Wipro. SAC ¶ 16. The Agreement outlined his annual base salary, and the process by which he could earn a Quarterly Performance Linked Compensation ("QPLC") bonus. Agreement at 5. Under the agreement, Parisi's QPLC bonus would "vary based on achievement of sales, profitability & utilization targets, or any other pre defined goals." *Id.* The Agreement provided, however, that a QPLC bonus "may be modified by the Company in its sole discretion." *Id.*

2

The Agreement separately included a choice-of-law provision. It provided that, with the exception of disputes relating to restrictive covenants, the Agreement would be "governed by and construed in accordance with the laws of Delaware." *Id.* at 9.[2]

### 3.   Parisi's Non-Reporting Concerns

In fall 2012, Parisi was "instrumental" in securing for Wipro a project with a large pharmaceutical client (the "Project"). SAC ¶¶ 27 –28. The Project involved compiling all necessary data for the client to meet its reporting obligations under the Physician Payments Sunshine Act, 42 U.S.C. §§ 1320a-7h, which mandates disclosure to the Center for Medicare and Medicaid Services ("CMS") of certain payments and items of value given to physicians and teaching hospitals. SAC ¶ 29. At a "kickoff meeting" for the Project, Wipro employees received information regarding Sunshine Act reporting guidelines and obligations. *Id.* ¶ 32.

Parisi claims that his performance on the Project, as well as on other projects assigned to him in 2012, met the expectations set out in his QPLC. *Id.* ¶¶ 24–26. He claims that he was therefore "owed and deserving of the entirety of his target QPLC" for 2012. *Id.* ¶ 24.

In late 2012, Parisi discovered that Wipro's internal systems did not contain any records crediting the Project to him or, indeed, any records indicating that the Project was active. *Id.* ¶ 35. Parisi discussed the absence of records on multiple occasions with Raizada, who told him the delay was due to the absence of a signed Statement of Work ("SOW"). Raizada explained that an SOW was necessary to trigger "(i) billing, (ii) recording in Wipro Pharma's financials, (iii) generation of invoices and purchase orders, and (iv) recording of credit to employees." *Id.* ¶ 37.

---

[2] Under the exempted section, restrictive covenants (which include confidentiality and non-compete agreements) are to be enforced by, as between the jurisdiction where the covenants was breached and the jurisdictions from which it is enforced—whichever give the covenants their highest degree of enforceability. Agreement at 9.

In late 2012 and January 2013, Parisi attempted unsuccessfully to speak further with Raizada about the continued absence of a signed SOW. *Id.* ¶ 43.  In late January or early February 2013, he personally confronted Raizada and a client partner, who informed him that Wipro and the client had sought to delay signing the SOW due to "problems with the Project, including failures to meet deadlines, delivery issues and . . . Project results/data . . . not turning out as the pharmaceutical client had hoped or planned." *Id.* ¶¶ 45–46.  Raizada and the client partner told Parisi not to worry about getting credit and to "keep quiet." SAC ¶ 47.

Parisi continued to inquire as to the project's status.  By early 2013, he came to believe the delay in reporting was because the "client would not be able to comply with the [Sunshine Act] reporting deadline" and, by keeping the SOW unsigned, Wipro could "justify or explain a possible failure by the client" to meet the deadline.  *Id.* ¶¶ 49–50. And while Parisi's initial concern had been the non-payment of his bonus, he developed the added concern—based on the absence of records of the project on Wipro's internal system and these other irregularities—that Wipro's internal non-reporting may lead to "large-scale false financial reporting" in violation of the Sunshine Act.  *Id.* ¶¶ 59–60.

In forming that concern, however, Parisi erroneously believed the reporting deadline for the Sunshine Act was March 2013.  The deadline had actually been extended to March 2014. *See* Dkt. 24 at 10.  Parisi claims he was not told and could not have learned of any extension of that deadline.  SAC ¶ 56.

### 4.    Parisi's Human Resources and Ombuds Complaints

On or about May 5, 2013, Parisi "learned for certain that he would not be receiving any QPLC bonus money for fiscal year 2012." *Id.* ¶¶ 74–75.  Shortly after receiving this news, Parisi reported the internal inconsistencies and "manipulations" he had observed to Wipro's human resources department ("HR").  *Id.* ¶ 75.  He also reported several instances in which co-workers

4

had made offensive jokes about the sexual orientation of another Wipro employee. *Id.* ¶¶ 72, 75,

85. Later, Parisi "called HR several times and initiated ultimately fruitless and empty email

exchanges with HR about the status of the investigations into those complaints." *Id.* ¶ 76.

In July 2013, Parisi filed a similar complaint with Ombuds, Wipro's internal reporting

department. *Id.* ¶ 78. In the Ombuds complaint, Parisi alleges that he had "a feeling" revenue

from his projects was not assigned to him "for possible personal gain [for other employees] and

. . . in retaliation for me requesting to be in a different position outside the group." Dkt. 34, Ex.

2, at 3. (Before learning he would not receive his bonus, Parisi had requested a transfer to the

Hunting group. *Id.* ¶ 68.) As a part of the Ombuds reporting process, Parisi was "required to

electronically-sign and agree to the terms of the Ombuds process." SAC ¶ 79. That interaction,

he alleges, constituted a second contract with Wipro. *Id.*

Ombuds "found merit" in Parisi's complaints and directed Wipro to pay him some bonus

money from 2012—money which Parisi did not believe constituted the full amount owed to him.

*Id.* ¶ 91–92.

After his complaint to Ombuds, Parisi claims, his managers took a series of retaliatory

acts against him, including (1) assigning his projects to others, (2) cancelling his meetings, and

(3) depriving him of the potential to earn his expected 2013 bonus. *Id.* ¶¶ 86–88, 93.

### 5.    Parisi's Termination

On October 18, 2013, Parisi was put on a performance improvement plan ("PIP") based

on supervisors' claims that he was not meeting performance goals and expectations. *Id.* ¶ 93.

Parisi alleges that Raizada's participation in the PIP process violated Wipro policies "including

those regarding confidentiality, privacy and conflicts." *Id.* ¶ 104. Parisi separately alleges that

Ombuds determined that he should not have been placed on the PIP in the first place. *Id.* ¶ 97.

In March 2014, at the end of the 90-day PIP, Wipro terminated Parisi. *Id.* ¶ 112.

### B.    Procedural History

On May 1, 2015, Parisi filed a complaint in New York state court, alleging that retaliatory acts by Wipro entitled him to relief under New Jersey and Delaware whistleblower statutes.  He further alleged the tort of wrongful discharge (based on his termination) and breach of contract (based on the termination and other retaliatory acts).  Dkt. 1–2.  Parisi's initial complaint also brought a claim under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733.

On May 18, 2015, Wipro removed the case to federal court based on federal question jurisdiction because the initial complaint included the FCA claim. Dkt. 1–2.  On July 21, 2015, after Parisi voluntarily dismissed the FCA claim, the district court remanded the case to state court. *Id.*  On January 15, 2016, Wipro moved to dismiss the initial complaint. *Id.*

On February 12, 2016, Parisi filed his First Amended Complaint ("FAC") in state court. *Id.*  On March 10, 2016, Wipro removed the case again, this time based on diversity jurisdiction. Dkt. 1.  On April 7, 2016, Wipro moved to dismiss the FAC.  Dkt. 12.

On April 29, 2016, Parisi filed the SAC.  Dkt. 21.  On May 20, 2016, Wipro filed this motion to dismiss the SAC. Dkt. 23.  On June 6, 2016, Parisi filed a memorandum of law in opposition to the motion to dismiss.  Dkt. 30.  On June 10, 2016, Wipro filed a reply.  Dkt. 32.

## II.    Discussion

The SAC brings four claims against Wipro: (1) retaliation under New Jersey's Conscientious Employee Protect Act ("CEPA"), N.J.S.A. 34:19-1–19-8; (2) retaliation under the Delaware Whistleblowers' Protection Act ("DWPA"), 19 Del. C. § 1701 *et seq.*; (3) common law wrongful discharge; and (4) breach of contract, based on asserted breaches of (a) the Agreement, (b) the terms and conditions of the Ombuds process, and (c) an "implied covenant of good faith and fair dealing," SAC ¶ 160.  Parisi further seeks, under the Agreement, reimbursement by Wipro of his attorneys' fees and costs.

6

At the outset, the Court addresses Parisi's argument that the Court should remand this action to state court because, when Wipro first removed the case, Wipro improperly failed to invoke diversity jurisdiction alongside federal question jurisdiction as a basis for removal. Parisi argues that Wipro was thus barred from later removing the SAC on that ground. In so arguing, Parisi concedes that the requirements for diversity jurisdiction under 28 U.S.C. § 1332(a)(2) are met: There is complete diversity of citizenship between Parisi and Wipro and the amount in controversy exceeds $75,000. Instead, Parisi faults Wipro for not invoking diversity jurisdiction at the first possible opportunity.

Whatever its merits, Parisi's argument for remand fails because it is untimely. "Under 28 U.S.C. § 1447(c), to avoid waiver of any procedural defects in the notice of removal, a motion for remand must be filed within thirty days of the filing of the notice of removal." *Phoenix Glob. Ventures, LLC v. Phoenix Hotel Associates, Ltd.*, 422 F.3d 72, 75 (2d Cir. 2005). In "rare occurrences," a district court may, in its discretion, excuse a failure to comply with the 30-day deadline, *Scantek Med., Inc. v. Sabella*, No. 08 Civ. 453 (CM), 2008 WL 2518619, at *3 (S.D.N.Y. June 24, 2008), but only in "exceptional circumstances," such as, for example, when "a mechanical quirk of the electronic case filing system" prevented timely filing of a motion for remand, *id.* (citing *Phoenix Glob. Ventures, LLC*, 422 F.3d at 76). Here, Parisi challenged Wipro's removal on June 3, 2016, nearly three months after the March 10, 2016 removal, but he identifies no circumstance justifying the delay. The Court, therefore, being satisfied that it has subject matter jurisdiction, declines to remand, and evaluates the motion to dismiss on the merits. *See Kanayama v. KESY LLC*, No. 14 Civ. 3405 (JFK), 2015 WL 1433203, at *5 (S.D.N.Y. Mar. 30, 2015) ("The Court sees no reason to exercise whatever discretion it may have to excuse the

late filing."); *Scantek Med., Inc.*, 2008 WL 2518619, at *4 ("The Motion to Remand was filed seven days late. I decline in an exercise of my discretion to consider it.").

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. If the plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Id.* at 570.

In considering a motion to dismiss, a district court must "accep[t] all factual claims in the complaint as true, and dra[w] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F. 3d 395, 403 (2d Cir. 2014) (internal quotation marks omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's factual allegations must be enough to raise a right to relief above the speculative level, i.e., enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F. 3d 110, 120 (2d Cir. 2010) (internal quotation marks, citation, emphasis, and alteration omitted).

Here, for the reasons that follow, the Court grants Wipro's motion to dismiss, because the SAC fails to state any claim for which relief can be granted. The Court address each of the SAC's four claims in turn, beginning with his CEPA claim.

### A.    Parisi's CEPA Claim

CEPA, "commonly referred to as a 'whistle-blower act,'" *Smith v. Grobet File Co. of Am.*, No. 02 Civ. 4149 (DC), 2003 WL 22047869, at *2 (S.D.N.Y. Aug. 29, 2003), is a New Jersey statute that "was passed to 'protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from'" retaliating against employees who reported such activities. *Flick v. Am. Fin. Res., Inc.*, 907 F. Supp. 2d 274, 279 (E.D.N.Y. 2012) (quoting *Dzwonar v. McDevitt*, 177 N.J. 451, 461 (N.J. 2003)).  In relevant part, CEPA provides:

> An employer shall not take any retaliatory action against an employee because the employee . . . objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes: (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ; (2) is fraudulent or criminal . . . ; or (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

N.J.S.A. 34:19-3.

To state a claim under CEPA, a plaintiff need not show that his or her employer actually committed any violation. *Flick*, 907 F. Supp. 2d at 280.  The plaintiff must, however, "show[,] as a threshold matter, a *reasonable belief* that 'his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy.'"  *Id.* (quoting *Dzwonar*, 177 N.J. at 462) (emphasis added); *see Dzwonar*, 177 N.J. at 464 (plaintiff bears burden of "set[ting] forth facts that would support an objectively reasonable belief that a violation has occurred").

Here, the SAC seeks relief under CEPA, claiming that Wipro engaged in a series of activities, including terminating his employment, in retaliation for his internal whistleblowing. SAC ¶ 126.  The SAC fails to state a CEPA claim for three reasons.

First, the SAC does not allege that Parisi had a reasonable belief that Wipro's conduct was violating the Sunshine Act or any other clearly identified law, rule, regulation, or policy. Wipro, in fact, is itself incapable of violating the Sunshine Act because it is not a manufacturer nor a health care provider. It was Wipro's pharmaceutical client, not Wipro, that had reporting obligations under the Sunshine Act. *See* 42 U.S.C. §§ 1320a-7h.

Moreover, because the Final Rule implementing the Sunshine Act regulations extended the first reporting deadline to March 31, 2014, it was not objectively reasonable for Parisi, in early 2013, to believe that Wipro was in danger of missing a far-off reporting deadline. Under the adopted regulations, employers did not even need to begin collecting reportable data until August 1, 2013. Dkt. 24 at 10. The SAC attempts to excuse Parisi's misunderstanding of the deadline, and to cast as reasonable his belief that Wipro was violating the Sunshine Act, by alleging that Parisi was "in the dark" about the Project, SAC ¶ 55, and that, "as a . . . result of the scope of his job responsibilities," he had "no reason to be informed of any extensions of the . . . reporting deadline," *id.* ¶ 54. But Parisi's limited understanding of the Sunshine Act and its deadlines, and of the status of the Project itself, underscores that it was not reasonable for him to jump to the conclusion—to assume, based on scant information—that a violation was afoot.

Second, on the facts pled, CEPA does not apply to Parisi. "CEPA is generally only available to New Jersey employees . . . ." *Papalini v. Sensient Colors, Inc.*, No. 11 Civ. 6392, 2012 WL 1345353, at *4 (D.N.J. Apr. 18, 2012). Here, Parisi was based in Wipro's New York office, worked primarily in New York and was, for all intents and purposes, a New York employee. *See* SAC ¶ 13. That Parisi's work sometimes took him to New Jersey did not make him a New Jersey employee. *See Papalini*, No. Civ. 11-6392, 2012 WL 1345353 at *4 (plaintiff who worked as account manager for territory that included New Jersey, and who maintained

most client accounts in New Jersey, was nonetheless a Pennsylvania employee not covered by CEPA); *Peikin v. Kimmel & Silverman, P.C.*, 576 F. Supp. 2d 654, 656 (D.N.J. 2008) (dismissing a New Jersey Law Against Discrimination claim brought by employee who "worked four out of five days each week in New Jersey . . . with approximately 90% of her work centering around New Jersey-based clients and cases" because "undisputed evidence in the record," including that she was a Pennsylvania resident based out of her employer's Pennsylvania office, "indicate[d] that [her] state of employment was Pennsylvania" (internal quotation marks omitted)).  To be sure, "CEPA's remedies may be available to an out-of-state employee in limited circumstances, such as where the defendants caused wrongdoing in New Jersey or made or influenced the decision to terminate the plaintiff in New Jersey." *Id.*  But the SAC does not, however, plead sufficient facts to demonstrate that this is such a circumstance. Nor does Parisi cite case law extending CEPA to an out-of-state employee.  The SAC thus fails to plead facts establishing Parisi's eligibility for relief under New Jersey's whistleblower statute.

Third, under CEPA's waiver provision, a plaintiff like Parisi who brings a CEPA claim may not initiate any other retaliation or whistleblowing claims, whether under the common law or other state statutes. *See* N.J. Stat. Ann. § 34:19-8.  ("[T]he institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law"); *see also Young v. Schering Corp.*, 141 N.J. 16, 29 (1995) ("[O]nce a CEPA claim is instituted, any rights or claims for retaliatory discharge based on a contract of employment; collective bargaining agreement; State law . . . the courts, the common law or rules of court; or regulations or decisions based on statutory authority, are all waived." (internal quotation marks omitted)).  Waiver "applies only to those causes of action that require a finding

11

of retaliatory conduct that is actionable under CEPA" and "does not apply to those causes of action that are substantially independent of the CEPA claim." *Id.* In determining substantial independence, "[t]he question is whether the other claims require different proofs from those required to sustain a CEPA claim." *Ivan v. Cty. of Middlesex*, 595 F. Supp. 2d 425, 465 (D.N.J. 2009). The SAC brings a CEPA claim alongside multiple additional state law and common law claims, all based on claims of the same retaliatory conduct. In so doing, the SAC waived the right to bring claims under CEPA.

Accordingly, the SAC fails to state a claim under CEPA.

**B.     Parisi's DWPA Claim**

The DWPA, Delaware's whistleblower statute, protects employees who report "a violation, which the employer *knows or reasonably believes* has occurred or is about to occur." 19 Del. C. § 1703 (emphasis added). The DWPA defines a "violation" as "an act or omission by an employer, or an agent thereof, that is . . . [m]aterially inconsistent with, and a serious deviation from, standards implemented pursuant to a law, rule, or regulation." *Id.* § 1702.

The DWPA claim brought in the SAC, based on the same "retaliatory actions" as Parisi's CEPA claim, *see* SAC ¶¶ 131–40, fails for two reasons. First, for the reasons above, the SAC does not plead that Parisi had either knowledge or a reasonable belief of any violation by Wipro. Second, the DWPA does not apply to Parisi, because that statute does not "provide protection to any class other than individuals employed in the State of Delaware." *Curlett v. Madison Indus. Servs. Team, Ltd.*, 863 F. Supp. 2d 357, 362 (D. Del. 2012). As discussed, Parisi was a New York employee. The SAC does not plead facts supporting that his intermittent business travel to Delaware made him a Delaware employee within the scope of, and entitled to bring claims under, the DWPA. Nor does Parisi supply legal support for the notion that "a contractually

12

agreed-upon choice of law provision" in his employment contract, stating that Delaware law would govern the Agreement, should "operate as a waiver of any requirement that the employee actually be employed in Delaware" for DWPA purposes. Dkt. 30 at 18. Accordingly, the SAC fails to state a claim under the DWPA.

### C.    Parisi's Wrongful Discharge Claim

The SAC next claims that Wipro's termination of Parisi's employment "constitutes common law wrongful discharge in violation of clear mandates of public policy, federal law and/or the laws of the State of New York, State of New Jersey and/or State of Delaware." SAC ¶ 147. This claim fails because New York law applies to this dispute, and New York does not recognize a tort action for wrongful discharge.

### 1.    Applicability of New York Law

"When a federal court sitting in diversity faces conflicting laws, it applies the choice-of-law principles of the state in which it sits." *Pierre v. Gts Holdings, Inc.*, No. 15 Civ. 143 (PAC), 2015 WL 7736552, at *2 (S.D.N.Y. Nov. 30, 2015). Here, the Court applies the choice-of-law principles of New York.

Under these principles, to determine which state's law will apply in a tort case, "courts apply the greater interest test, whereby courts apply the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." *Pierre*, 2015 WL 7736552, at *2 (internal quotation marks omitted). "Under New York choice of law rules, tort claims are outside the scope of contractual choice of law provisions." *Burns v. Del. Charter Guar. & Trust Co.*, 805 F. Supp. 2d 12, 22 (S.D.N.Y. 2011). Accordingly, the Court applies the greater interest test here, notwithstanding that Delaware law governs the Agreement. *See* Dkt. 30 at 14.

Under the greater interest test, New York law governs Parisi's wrongful discharge claim. Parisi is domiciled in New York and worked for Wipro primarily in New York, SAC ¶¶ 1, 13, and "New York . . . has a substantial interest in protecting employees who live and work in New York." *Pierre*, 2015 WL 7736552, at *4. Although Parisi did perform some work in New Jersey and Delaware, when conducting the greater interest test, "the Court looks to where [a plaintiff] performed *most* of his work." *Id.* (emphasis added).

### 2.      Analysis of Parisi's Tort Claim under New York Law

The determination that New York law applies is fatal to Parisi's wrongful discharge claim because New York does not recognize the common law tort of wrongful discharge. *Lobosco v. N.Y. Tel. Co./NYNEX*, 96 N.Y.2d 312, 316 (2001). Accordingly, the Court must dismiss this claim as well.

### D.      Parisi's Breach of Contract Claim

Parisi lastly alleges that Wipro breached (1) the Agreement, SAC ¶ 152; (2) "the terms and conditions of the Ombuds process," *id.*; and (3) "the implied covenant of good faith and fair dealing inherent in and associated with the Agreement, the terms and conditions of the Ombuds process, and the mutual obligations inherent in and associated with the employer-employee relationship," *id.* ¶ 160. The Court analyzes these allegations in turn.

### 1.      Breach of the Agreement

Under the Agreement's choice-of-law provision, Delaware law governs Parisi's claim that Wipro breached the Agreement. Agreement at 9. "[T]raditional New York choice-of-law rules . . . uphold a choice-of-law clause" where, as here, there is no "fraud or a violation of public policy" and "the state selected has sufficient contacts with the transaction." *Innovative BioDefense, Inc. v. VSP Techs., Inc.*, No. 12 Civ. 3710 (ER), 2013 WL 3389008, at *3 (S.D.N.Y. July 3, 2013).

To state a claim for breach of contract under Delaware law, Parisi "must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *McBeth v. Porges*, 171 F. Supp. 3d 216, 229 (S.D.N.Y. 2016) (internal quotation marks omitted).

The SAC does not state a viable claim for breach of the Agreement. It adequately alleges the first requirement—the existence of a contract—by identifying the Agreement itself. SAC ¶ 16. But it does not adequately allege the second requirement—breach of an obligation imposed by that contract—because it does not identify a specific obligation of the Agreement that Wipro breached. Rather, it alleges conclusorily that Wipro's conduct "constitutes numerous breaches of the Agreement." *Id.* ¶ 152. But conclusory allegations do not make a claim plausible. *See Iqbal*, 556 U.S. at 678. And to the extent that Parisi asks the Court to read the SAC to allege that Wipro breached the Agreement by failing to pay the bonuses he was owed for 2012 and for 2013, the SAC does not provide sufficient facts to support this allegation. On the contrary, the Agreement provides that any bonus was discretionary. Agreement at 5.

The Court dismisses this breach of contract claim.

### 2.    Breach of the Ombuds Contract

The SAC separately alleges that Wipro breached the "terms and conditions" of the Ombuds process. Parisi contends that the "terms and conditions constituted yet another contractual agreement between [Parisi] and Wipro," SAC ¶ 79, which provided (1) that Parisi would not "be the target of harassment, victimization (including informal pressures) or retaliation for a complaint made or concern raised in good faith to Ombuds," *id.* ¶ 80, and (2) Wipro would comply with all recommendations made by Ombuds, *id.* ¶ 81. The SAC alleges that Wipro breached this agreement because retaliation continued after the Ombuds complaint and Wipro did not comply with all Ombuds recommendations. *Id.* ¶¶ 89–92.

15

This claim fails because, even accepting, *arguendo*, the allegation that the terms and conditions are in fact a contract, that contract is between Parisi and Global Compliance Services ("GCS"), a third party that administers the internet portal through which individuals may make a report to the Wipro Ombuds. *See* Dkt. 34–1. They do not make out a contract with Wipro, and thus any breach cannot not give Parisi a cause of action against Wipro.

Accordingly, the Court dismisses this breach of contract claim.

### 3.      Breach of the Covenant of Good Faith and Fair Dealing

The SAC's final breach of contract claim is that Wipro breached an implied covenant of good faith and fair dealing.  SAC ¶ 160.

Because Delaware law applies to the Agreement, it also applies to the action for breach of the Agreement's implied covenant of good faith and fair dealing. *See Butvin v. DoubleClick, Inc.*, No. 99 Civ. 4727 (JFK), 2001 WL 228121, at *7 (S.D.N.Y. Mar. 7, 2001) (applying Delaware choice-of-law provision in contract to implied covenant breach of contract claim). Under Delaware law, "the implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Gilman v. Marsh & McLennan Companies, Inc.*, 85 F. Supp. 3d 757, 768 (S.D.N.Y. 2015), *aff'd*, 826 F.3d 69 (2d Cir. 2016) (internal quotation marks omitted).

"Where a claim for a breach of the implied covenant of good faith and fair dealing is duplicative of a breach of contract claim, it must be dismissed." *Policemen's Annuity & Benefit Fund of City of Chicago v. Bank of Am., NA*, 907 F. Supp. 2d 536, 558 (S.D.N.Y. 2012).

Here, the SAC's claim for breach of the implied covenant duplicates its breach of contract claim, as both claims are based on the same facts and seek the same damages. *Cf. Deutsche Bank Nat. Trust Co. v. Quicken Loans Inc.*, 810 F.3d 861, 869 (2d Cir. 2015)

("[C]laims are duplicative when both arise from the same facts and seek the identical damages for each alleged breach" (internal quotation marks omitted).).

The Court therefore dismisses this claim, too.

### E.      Dismissals With and Without Prejudice

The Court dismisses the CEPA, DWPA, and wrongful discharge claims with prejudice because these causes of action are inherently unavailable to Parisi for the reasons reviewed above. *See Lever v. Entergy Nuclear Operations Inc.*, No. 15 Civ. 3327 (KAM), 2016 WL 1627619, at *6 (E.D.N.Y. Apr. 22, 2016) ("The court . . . dismisses the current action with prejudice because amendment to the complaint would be futile.").

The Court, however, dismisses the SAC's breach of contract claims without prejudice. There remains some possibility, however limited, that an amended pleading could properly state a breach of contract claim. This is the first time the SAC has been reviewed on the merits, and it is conceivable—although far from apparent—that, in light of the guidance provided by this review, an amended complaint could resurrect the breach of contract claims. Conceivably, Parisi might, for example, identify a specific obligation of the Agreement that Wipro allegedly breached by denying him a bonus. Accordingly, the Court gives Parisi leave to amend the SAC, limited to breach of contract claims.

### F.      Parisi's Request for Fees

The SAC, finally, asks the Court to order Wipro to pay all "costs, fees and expenses" that Parisi incurred, based on the Agreement's provision that "'[t]he prevailing party in any legal action between the parties arising out of this Agreement will be entitled, in addition to any other rights and remedies such party may have, to reimbursement for such party's legal expenses, including court costs and reasonable attorney's fees.'" SAC ¶ 168 (quoting Agreement at 10). Because the SAC fails to state a claim, Parisi is not a prevailing party and is not entitled to fees.

## CONCLUSION

For the reasons above, the Court grants Wipro's motion to dismiss Parisi's CEPA, DWPA, and wrongful discharge claims with prejudice.  The Court dismisses Parisi's breach of contract claims without prejudice.[3]  The Court denies Parisi's request for fees.

The Clerk of the Court is respectfully directed to close the motions pending at Dkt. 12 and Dkt. 23.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: November 23, 2016
       New York, New York

---

[3] Any amended complaint as to Parisi's contract claims is due by Wednesday, December 14, 2016.  Following that date, the Court's dismissal of these claims will be with prejudice.

18